IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JACK CHRISTIANSEN and MARIE CHRISTIANSEN, <br><br> Plaintiffs, <br><br> vs. <br><br> THANE SYVERSON, REBEKAH SYVERSON, and DOES 1-10, <br><br> Defendants. | 3:19–cv–365–DWM <br><br><br> OPINION <br> and ORDER |

This fraud action arises out of a real property disclosure statement. In 2010, Plaintiffs Jack and Marie Christiansen purchased a property at 323 Barley Drive in Lenore, Idaho (the "Property"). The Property is approximately twenty (20) acres with a refurbished farmhouse. In September 2017, the Christiansens were performing house repairs and discovered vermiculite in the attic, which later tested positive for asbestos. Further investigation uncovered asbestos-contaminated construction remnants from a previous house remodel, performed by Defendants Thane and Rebekah Syverson. The Syversons, however, had completed a disclosure statement averring there was no asbestos or other hazardous substance on or in proximity to the Property. (*See* Doc. 1 at 28–31.)

1

The case is set for jury trial on March 22, 2021. (Doc. 25.) The parties seek to limit expert testimony. (Docs. 23, 28.) The motions are addressed in turn.

ANALYSIS

**I.     The Christiansens' Motion re Bruce C. Jolicoeur (Doc. 23)**

On September 11, 2020, the Syversons served a timely expert disclosure and report for Bruce Jolicoeur, a property appraisal and evaluation professional. (Doc. 23-1 at ¶ 7; *id.* at 4–17.) Then, on October 22, the Christiansens served supplemental discovery responses, disclosing additional documents and information about asbestos abatement not previously available. (*Id.* at 19–71.) The Syversons then provided the Christiansens with a supplemental report for Mr. Jolicoeur, dated November 18, 2020. (Doc. 23-2 at ¶ 4; *id.* at 9–74.)[1]

The Christiansens seek to limit Jolicoeur's testimony in two ways. First, they argue that he should be limited to the matters disclosed in his timely September 11 disclosure or those "strictly related" to the Christiansens' subsequent October 22 supplemental discovery responses. Second, they argue he should be prohibited from offering any testimony related to information obtained from Michael Cooper or Industrial Hygiene Resources. Their requested relief is granted as to the untimely disclosure and granted in part as to reference to Cooper.

---

[1] Though the Syversons disclosed two reports for Jolicoeur on November 23, they are identical other than correcting a minor typographical error, (Doc. 23-2 at ¶ 4), and are referred to herein as the November 18 report.

2

### A. November 18 report

As discussed in the Court's previous order on expert testimony, (*see* Doc. 21), parties are required to make their expert disclosures at the time and in the manner ordered by the Court, *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011). If a party fails to properly disclose this information, the party cannot use the non-disclosed information at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). The parties were reminded of this potential sanction in the Scheduling Order, which states: "An inadequate report or disclosure may result in exclusion of the expert's opinions at trial even though the expert has been deposed." (Doc. 14 at ¶ 11(c).)

The Christiansens argue that the November 18 report includes a "host of information" that is neither included in Jolicoeur's September 11 report nor responsive to the Christiansens' supplemental discovery responses. More specifically, it contains:

- Detailed analysis of the local (North Central Idaho) economy and real estate market;
- Photographs and descriptions of the [Christiansens]' home and property;
- Discussion of four (4) purportedly comparable sales;
- Discussion of conversations Mr. Jolicoeur states he had with several area realtors;
- An analysis of the impact on property values of asbestos siding and vermiculite;

3

- An appraisal value of [the Christiansens]' property as of Jack Christiansen's April 2010 purchase[;] and
- An estimate of the asbestos' impact on the property value as of April 2010.

(Doc. 23 at 4.) In response, the Syversons argue that Jolicoeur's September 11 report contained references to all the above information, (*see* Doc. 23-1 at 7), but simply did not contain the additional documents and photographs provided in the November 18 report. The Syversons also argue that the Christiansens' subsequent abatement efforts "dramatically alter[ed] the scope of the subject property's valuation and the landscape of this litigation." (Doc. 26 at 5.)

A comparison of the two disclosures and reports demonstrates a significant discrepancy. While the expert disclosures are almost identical, (*compare* Doc. 23-1 at 5–9 *with* Doc. 23-1 at 9–14), and both reports contain the September 11 five-page letter, (*compare* Doc. 23-1 at 11–17 *with* Doc. 23-2 at 16–22), the November 18 report includes a 50-page Appraisal Report, (*see* Doc. 23-2 at 24–74). Based on the current record, it appears that this 50-page appraisal was not disclosed to the Christiansens in any form until November 18. (*But see id.* at 25 (Jolicoeur stating that he initially drafted an appraisal report on September 23, 2020).)

In his appraisal, Jolicoeur valued the property as of April 2010 both with and without knowledge of the presence of asbestos and vermiculite. (*See id.* at 34.) He ultimately concludes that the difference in market value as of that date was $11,000. (*See id.* at 66–67.) Because the crux of the report is the Property's value

4

ten years ago, it contains only three references to the Christiansens' October 2020 abatement efforts. (*See id.* at 51, 62, 66.) The remainder of the information was either known to Jolicoeur or could reasonably have been known to him prior to September 11. It therefore should have been disclosed by that date and the Syversons present no argument for why it was not. And to say that the information was incorporated by reference in the September 11 report ignores the explicit requirements of Rule 26(a)(2)(B)(i)–(iii) of the Federal Rules of Civil Procedure.

Based on the above, Jolicoeur's November 18 Appraisal Report is excluded in its entirety. While this is more relief than the Christiansens request, it is unclear how the discrete references to the October 2020 abatement efforts could be presented without opening the door to the rest of the report.

**B.     Testimony related to Cooper or Industrial Hygiene Resources**

On July 22, 2020, the Syversons disclosed Cooper as a liability expert in the case, specializing in environmental health and safety matters. (See Doc. 17-1 at 16–29.) But the Court excluded Cooper from testifying as a liability expert because his disclosure did not comply with Rule 26(a)(2)(B). (Doc. 21.) Nonetheless, both Jolicoeur's September 11 report and November 18 report contain references to either Cooper or his company, Industrial Hygiene Resources. The expert disclosures state that Jolicoeur "considered information discovered . . .

5

in conversations" with Cooper and others in reaching his conclusions. (*See* Doc. 23-1 at 7; Doc. 23-2 at 11.) The September 11 report then states:

> Industrial Hygiene Resources averred that:
> - If left in-place and undisturbed, the vermiculite posed no health hazard;
> - The asbestos siding is not friable and posed no health hazard;
> - The buried construction materials posed no health hazard as long as they are left undisturbed;
> - The vermiculite, asbestos siding and the buried materials would not create a concern sufficient to cause a government agency, such as the Environmental Protection Agency to seek action[; and]
> - The removal and remediation of the vermiculite was thorough and professional; the likelihood of residual friable vermiculite is very low[.]

(Doc. 23-1 at 12.) The November 18 report restates several of Cooper's observations and opinions, specifically focusing on whether the undisturbed materials posed a threat and/or needed to be removed. (Doc. 23-2 at 64, 66.) The Christiansens "request that this Court prohibit [the Syversons] from offering any testimony by Mr. Jolicoeur based on or related to any information obtained from" Cooper or his business. (Doc. 23 at 6.)

The Rules of Evidence explicitly contemplate an expert's reliance on inadmissible information:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

6

Fed. R. Evid. 703. Accordingly, a court must consider first, "whether the facts are of a type reasonably relied on by experts in a particular field" and second, "whether the probative value of the underlying data substantially outweighs its prejudicial effect." *Turner v. B.N.S.F. Ry. Co.*, 338 F.3d 1058, 1061 (9th Cir. 2003). This analysis becomes more complicated, however, when the otherwise inadmissible evidence is the observations and opinions of a previously excluded, independent expert. While "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert," an expert cannot simply act as a "mouthpiece" for an expert of a different specialty. *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613–14 (7th Cir. 2002).

    **1.**    **Reasonable Reliance**

When an expert's proposed testimony is based wholly or in part on facts or data the witness obtained outside the courtroom through a method other than personal perception, the Court must make a preliminary determination under Rule 104(a) whether the facts on which the witness relied are of a type that experts in the witness's field of expertise reasonably rely on in reaching such opinions. Fed. R. Evid. 703. Though there is a "reliability" component to this determination, *Renaud v. Martin Marietta Corp., Inc.*, 972 F.2d 304, 308 (10th Cir. 1992), the fundamental inquiry is whether the expert would rely on the proffered information

7

in performing his or her job in real life, Fed. R. Evid. 703, advisory notes (explaining that the rule was designed "to bring the judicial practice into line with the practice of experts themselves when not in court"). This is because the purpose of Rule 703 is "not to prove the truth of the underlying facts," but rather the rule "is based on the idea that disclosure of the basis evidence can help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion." *Williams v. Illinois*, 567 U.S. 50, 78 (2012).

Here, the Syversons argue that asbestos abatement is generally outside an appraiser's area of expertise and that Jolicoeur reasonably relied on Cooper's information in reaching his conclusion. They emphasize that the Christiansens' appraisal expert similarly relied on outside opinions in valuing the Property. (*See* Doc. 18-1 at 11 (Rudd stating that he contacted outside experts about potential EPA cleanup costs).) Such reliance has also been generally accepted in the legal community: "In cases involving the valuation of property, for example, courts recognized that experts frequently derived their knowledge by both custom and necessity from sources that were technically hearsay—price lists, newspapers, information about comparable sales, or other secondary sources." *The New Wigmore* § 4.5.1 (2d ed. 2011) (collecting cases). Thus, the Syversons can establish reasonable reliance. And, even if they could not on the present record, an expert him or herself can show such reliance by stating that this is the type of

evidence generally relied upon in his or her field. *See Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 182 (4th Cir. 2010); *Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th Cir. 2000). Thus, Jolicoeur could further establish such reliance during his testimony.

That said, reasonable reliance is not the same as corroboration. "Using Rule 703 to introduce evidence of corroboration by other experts is generally inappropriate." *Wigmore* § 4.7.1(b)(1) (footnote omitted); *Weinstein's Fed. Evid.*, § 703.05[2] (2d ed. 2020). Rather

> [t]he witness must be testifying to his or her own opinion; he or she may take the opinion of others into consideration, but cannot merely be a conduit for the nonwitness's conclusions. So long as it appears that the witness has brought his or her own expertise to bear on the issues at hand, that the witness considered the opinions of other experts is no reason to exclude his or her testimony. That fact goes to weight, not admissibility.

*Jones on Evidence* § 46.17 (7th ed. 2016) (footnote omitted). This is distinguishable, however, from using one expert to bolster another's otherwise inadmissible testimony. *Id.*; *see also* Christopher Mueller & Laird Kirkpatrick, *Federal Evidence* § 7:16 (4th ed. 2013) (distinguishing between "relying on others" from "repeating what others say"). Such delineation presents a formidable challenge, however, that "calls for a considered judgment that there is enough of the expert's own independent appraisal in what he proposes to say to make his testimony useful and reliable by the force or weight of his own authority." *Jones*

9

*on Evidence* § 46.17 (footnote omitted). In this case, that challenge can be addressed by limiting what information Jolicoeur shares with the jury.

### 2. Probative Value

Rule 703 presents a balancing test that puts a thumb on the scale *against* the disclosure of inadmissible evidence: the otherwise inadmissible basis of Jolicoeur's opinion may be disclosed to the jury only "if [its] probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudice." Fed. R. Evid. 703. In their response to the current motion, the Syversons make no attempt to apply this balancing test to the facts here. But doing so, Jolicoeur's testimony will be limited to the fact that he consulted with an asbestos expert and relied on that information in reaching his conclusion. He will not be permitted to testify to the specifics of Cooper's conclusions or observations.

Here, Cooper's testimony was excluded based on an inadequate disclosure, not reliability concerns under Rule 702. As a result, there does not appear to be prejudice related to his qualifications. However, Jolicoeur's references merely restate Cooper's position, making them corroborative in nature. Thus, their probative value is limited. And, because Cooper's opinions have been excluded, allowing Jolicoeur to "simply parrot" them "would be to allow through the back door testimony that could not enter through the front door." *Columbia Grain, Inc. v. Hinrichs Trading, LLC*, 2015 WL 6675538, at *4 (D. Idaho Oct. 30, 2015). As a

10

result, Jolicoeur's testimony is limited to stating that he consulted with an asbestos expert and relied on that information in reaching his valuation opinion. Specific reference to Cooper or Industrial Hygiene Resources' observations, conclusions, and opinions are prohibited. Nevertheless, the Christiansens should note that they could open the door during cross-examination for Jolicoeur to explain his reliance on Cooper. *See* Fed. R. Evid. 705. The parties should therefore tread carefully.

### C. Conclusion

Based on the above, Jolicoeur's November 18 Appraisal Report is excluded, and his remaining testimony is limited to the fact that he consulted with an asbestos expert and relied on that information in reaching his opinion.

## II. The Syversons' Motion re Terry Rudd (Doc. 28)

The Syversons again challenge the expert testimony of the Christiansens' appraisal expert, Terry Rudd, this time on the basis that Idaho law limits the recovery of damages in this case to the difference between the fair market value of the property purchased and the price contracted for at the date of sale. They therefore reject Rudd's "Cost-to-Cure" evaluation and his assessment of "stigma" damages. Though the Syversons highlight obstacles to the Christiansens' recovery, exclusion of expert testimony on these grounds is not warranted.

### A. "Cost-to-Cure"

11

Rudd's expert report states that his valuation of the property is based on a comparison between "before" and "after" values. (*See* Doc. 18-1 at 11.) The "before" value is based on two dates, September 2017 (when the Christiansens learned of the problem) and November 2019 (the date the appraisal was completed). (*Id.*) The "after" value is "based on the full extent of the asbestos problem." (*Id.*) Put differently, the damages calculation is measured by the "cost-to-cure" the Property. (*Id.*) While much of the Syversons' challenge regarding the potential shortcomings of Rudd's method are best addressed on cross examination, they raise a legal question regarding recoverable damages.

The Syversons argue that Idaho limits damages in a fraud case such as this to the difference between the fair market value and the price paid for the real property. In doing so, they rely primarily on *Hibbler v. Fisher*, 712 P.2d 708 (Idaho 1985). In *Hibbler*, plaintiffs alleged misrepresentation, breach of implied warranty, and negligence based on problems they had with the water system in a trailer park they purchased. *Id.* at 710. Following a jury verdict in plaintiffs' favor, the court entered a judgment notwithstanding the verdict nullifying their victory. *Id.* One of the issues on appeal was whether plaintiffs could recover replacement and repair damages as part of their fraud action. *Id.* at 712. The Idaho Supreme Court, harkening back to its earlier decision in *Shrives v. Talbot*, 421 P.2d 133, 140 (Idaho 1966), explained that the Court

> has long been committed to the rule that in order to show damage from fraud the purchaser of property must show that the property he obtained was of less value than the price paid for it. *Smith v. Neeley,* 39 Idaho 812, 818; 231 P. 105, 106 [1924]. This principle was reiterated as late as 1964, in *Andrus v. Irick,* 87 Idaho 471, 394 P.2d 304 [1964]. Thus where the purchaser seeks damages for alleged fraud it appears Idaho is committed to the "out-of-pocket" rule which limits the recovery of damages to the difference between the real value of the property purchased and the price paid or contracted for. This court has often recognized the existence of a different measure of damages referred to as the "benefit-of-bargain" rule, under which the damages allowed are the difference between the real value of the property purchased and the value which it would have had had the representations been true.

*Id.* The Court therefore determined that "Idaho case law does not support replacement cost as an appropriate remedy for fraud[,]" and because plaintiffs presented no market values, concluded that "the evidence presented no basis to calculate damages for fraud." *Id.*

Though the Syversons accurately read *Hibbler*, it is merely the tip of the iceberg. They are correct that over the last century Idaho courts have consistently recognized the "out-of-pocket" and "benefit-of-bargain" tests. *Smith v. Neeley*, 231 P. 105, 106 (Idaho 1924); *Weitzel v. Jukich*, 251 P.2d 542, 544–45 (Idaho 1952); *Shrives*, 421 P.2d at 140; *Nelson v. Armstrong*, 582 P.2d 1100, 1105 n.1 (Idaho 1978); *Hibbler*, 712 P.2d at 712; *Watts v. Krebs*, 962 P.2d 387, 392 (Idaho 1998). But, in doing so, courts have made clear that the proper measure of fraud damages is not "[w]hat the plaintiff might have gained" but rather "what he had lost by being deceived into the purchase." *Stigafus v. Porter*, 179 U.S. 116, 122

(1900). Courts are therefore reluctant, for example, to allow damages based on speculative future profits associated with the property. *Frank v. Davis*, 203 P. 287, 288 (Idaho 1921); *Selman v. Shirley*, 85 P.2d 384, 394 (Or. 1938);[2] *Weitzel*, 251 P.2d at 544–45.

Nevertheless, courts have recognized that fraud damages can extend to those costs "legitimately attributable to defendant's fraudulent conduct." *Stigafus*, 179 U.S. at 122–23, 125; *Selman*, 85 P.2d at 394 ("Thus, we get back to the one rule which is of universal application: the party guilty of the fraud is liable for such damages as naturally and proximately result from the fraud."); *Weitzel*, 251 P.2d at 545. This idea was recently reaffirmed by the Idaho Supreme Court, which stated: "The benefit of the bargain and out-of-pocket rules are not exclusive[;]" rather

> [t]he underlying principle is that the victim of fraud is entitled to compensation for every wrong which is the natural and proximate result of the fraud. The measure of damages which should be adopted under the facts of a case is the one which will effect such result.

*April Beguesse, Inc. v. Rammell*, 328 P.3d 480, 491 (Idaho 2014) (quoting *Weitzel*, 251 P.2d at 546). The Syversons do not address this nuance.

Moreover, despite the Syversons' characterization of damages as a purely legal question that can be resolved pretrial, the damages determination occurred post-trial or on a motion for directed verdict in all of the cases surveyed. This

---

[2] Though an Oregon case, *Selman* is repeatedly cited in Idaho caselaw in this area.

makes sense as a damages determination fundamentally depends on the evidence presented at trial and "which witnesses the jury f[inds] credible." *April Beguesse, Inc.*, 328 P.3d at 491–92. And, as discussed in Justice Burnett's oft-cited concurrence and dissent in the *Hibbler* case, there is a difference between arguing for repair and replacement damages in and of themselves and arguing that replacement and repair costs may aid the jury in determining the "out-of-pocket" difference in value. 712 P.2d at 717; *see Addy v. Stewart*, 207 P.2d 498, 501 (Idaho 1949) (concluding that while $800 in sewer installation cost "may have been proper evidence to assist the jury in arriving at the amount allowed, it is not the true measure of recovery"); *Koehler v. Stenerson*, 260 P.2d 1101, 1106 (Idaho 1953) (similar); *Jensen v. Bledsoe*, 593 P.2d 988, 992 (Idaho 1979) (similar); *Watts*, 962 P.2d at 392 (similar). Here, even if limited to "out-of-pocket" loss, the Christiansens may be able use the amount spent on abatement and restoration as evidence that would help the jury determine the difference in value between the price paid and the property as delivered.[3]

Accordingly, the Syversons' motion to exclude Rudd's "cost-to-cure" approach pretrial is denied. This is not a final legal adjudication of recoverable damages, however, and this issue may be raised again once the proof is in.

---

[3] It is not clear whether the Christiansens would benefit from the application of the lesser-used "benefit-of-bargain" rule. Neither party addresses this question.

15

**B.     Stigma Damages**

The Syversons also seek to prevent Rudd from testifying to the award of "stigma" damages on the ground that Idaho law does not recognize such damages for this type of real property disclosure issue. The Syversons' argument is based on *White v. Mock*, a case addressing stigma damages arising from the failure to disclose mold and other water damage in the context of Idaho's Psychologically Impacted Property Statute, I.C. §§ 55–2801 to 2803. 104 P.3d 356, 360 (Idaho 2004). In *White*, the plaintiffs sued the seller of a home, alleging violations of the Idaho Property Disclosure Act, fraud, and violation of the Idaho Consumer Protection Act when they discovered mold and termites after purchasing the property. *Id.* at 359. Following trial, a jury found that the defendants did not commit fraud and, while they did find a violation of the Consumer Protection Act, they did not award damages. *Id.* Relevant here, the trial court denied the plaintiffs' motion for a new trial on the grounds "that the Psychologically Impacted Property Statute eliminates all stigma damages." *Id.* The Idaho Supreme Court affirmed. *Id.* at 360.

The impact of *White* and the Psychologically Impacted Property Statute on the present case is unclear. The first problem is determining what the statute actually does. While the plaintiffs in *White* sought stigma damages pursuant to the statute, *see id.*, the statute expressly states that "[n]o cause of action shall arise

against the owner of real property . . . for a failure to disclose to the transferee . . . that the real property was psychologically impacted," § 55-2802. Thus, the statute does not *create* a type of damages but rather *forecloses* them. Put differently, the purpose of the Psychologically Impacted Property Statute is to excuse sellers of residential real estate from having to disclose certain conditions that could "psychologically impact[]" property value (such as infectious disease, location of a homicide or suicide, or occupancy by a sex offender). *See* § 55-2801. Thus, under its plain language, the Psychologically Impacted Property Statute does not *authorize* the recovery of stigma damages in any instance.

The next question then is whether the statute *limits* the recovery of stigma damages here. Asbestos and/or environmental contamination do not fall within the enumerated "psychologically impacted" conditions for which nondisclosure is excused. *See* § 55-2802. To the contrary, Idaho's Property Condition Disclosure Act requires the disclosure of "material matters relating to the physical condition of the property" such as "the known presence of hazardous materials and substances." I.C. § 55-2506. It would therefore seem that the answer is "no," the Psychologically Impacted Property Statute does not apply and thus does limit recovery here. But the neat simplicity of that answer is obviated by *White*. In the same breath that the Court concluded the condition at issue in *White* (mold) was not a "psychologically impacted" condition and therefore the statute did not apply,

17

the Court upheld the trial court's determination that the statute "cannot be read to authorize" the stigma damages sought by the plaintiffs. 104 P.3d at 360. This conclusion is baffling as the statute does not authorize damages in any context, even those involving "psychologically impacted" conditions.

But even accepting *White*'s perplexing conclusion, it can be distinguished here. This is possible for two reasons. First, the district court in *White* recognized that there was no evidence of actual pollution or damage to the property: "there's no evidence in this case that there is, in fact, any sort of toxic mold on this property. And, in fact, the whole issue of toxic mold is one that is up in the air in the scientific community." *See* Brief, 2003 WL 24014570, at *10 (Nov. 26, 2003) (quoting trial transcript); *White*, 104 P.3d at 160 (noting the plaintiffs did not offer any proof there was mold on property at time of sale). In doing so, the district court described the plaintiffs' damages as "totally speculative" and specifically distinguished property damage based on recognized forms of pollution. Brief, at *10. Here, while the parties may dispute its cost and danger, it is undisputed that there is (or was) asbestos and vermiculite on the Property. And, this type of environmental contamination is undisputedly a form of pollution that can affect property value. Second, the *White* decision did not address damages in the fraud context because the jury found no fraud. 104 P.3d at 359 ("[A] jury found the Mocks did not commit fraud in the transaction.") Here, the Christiansens do not

seek redress under the Psychologically Impacted Property Statute and fraud is the only cause of action. It therefore seems that damages are limited to those discussed in the preceding section, which may or may not include stigma damages and their effect on property value. Ultimately, while the recoverability of such damages is uncertain, they are not necessarily foreclosed by *White v. Mock*. Thus, this is not a persuasive reason to limit expert testimony prior to trial.

Accordingly, the Syversons' motion to exclude Rudd's testimony as to stigma damages is denied, but they may pursue the damages question at trial.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the Christiansens' motion (Doc. 23) is GRANTED as outlined above.

IT IS FURTHER ORDERED that the Syversons' motion (Doc. 28) is DENIED, with the caveat that the parties may raise the issue of recoverable damages after the presentation of the proof.

DATED this 2nd day of February, 2021.

14:08 P.M.

Donald W. Molloy, District Judge
United States District Court